HARRY R. ROSEMAN & another *vs.* JOHN R. DAY & another.

Suffolk.     October 2, 1962. — November 5, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
& SPIEGEL, JJ.

*Landlord and Tenant,* Termination of lease, Common nuisance on premises
let, Waiver. *Nuisance. Waiver.*

Illegal sale of narcotic drugs by the proprietor of a leased drug store, even
if it made the store a common nuisance under G. L. c. 94, § 209, was not
a ground for annulment of the proprietor's lease under c. 139, § 19.
[94–95]

A finding that alleged violations of the liquor laws by the proprietor of a
leased drug store as a ground for annulment of his lease under G. L.
c. 139, § 19, were waived by the lessor was proper where the lessor
expressed indifference upon receiving reports of the alleged violations
and thereafter accepted at least one payment of rent, and based upon
another ground notices to the proprietor of termination of the lease.
[95, 98–99]

BILL IN EQUITY filed in the Superior Court on June 13,
1961.

The suit was heard by *Coddaire,* J.

*Gregory Sullivan* for the defendants.

*Herbert D. Lewis* for the plaintiffs.

WILKINS, C.J.     This bill for declaratory relief seeks a
determination of the validity of two leases of premises used
as a retail drug store at 391 and 393 Columbia Road in the
Dorchester district of Boston.     The plaintiff Roseman was
the original lessee from Jennie C. Day, who died leaving
the defendants as her heirs at law.     The plaintiff Bird
Pharmacy, Inc., is an assignee of the leases from Roseman.
A final decree declared that the assignment of the leases is
valid; that the leases are in full effect; and that the de-
fendants have no right to terminate.     The defendants ap-
pealed.     There are findings of the judge which we believe
he intended to be the equivalent of findings made under
G. L. c. 214, § 23.     The evidence is reported.

Roseman has been a licensed pharmacist since 1934. Prior to 1949 he operated a retail drug store at 393 Columbia Road under the name of Bird Pharmacy. On August 31, 1949, he acquired a lease of the premises at 391 Columbia Road, the lease incorporating an earlier lease dated March 25, 1943, of the premises at 393 Columbia Road. Roseman remodeled the two premises into one store. On April 5, 1938, May 6, 1946, and March 19, 1949, Roseman was convicted of the illegal sale of intoxicating liquor at the store.[1]

On or about August 18, 1960, Bird Pharmacy, Inc., was incorporated, and on June 7, 1961, Roseman assigned to it his pharmaceutical business and his interest in the leases. Roseman is the treasurer, a director, and the majority stockholder. The other officers and stockholders are his wife and sister-in-law.

In the spring of 1961 Roseman was convicted in the Municipal Court of the Dorchester District of ten violations of the statute relating to the sale of harmful drugs (G. L. c. 94, § 187A, as amended through St. 1960, c. 200) or of the narcotic drugs law (G. L. c. 94, § 199E, inserted by St. 1957, c. 660, § 1; see now St. 1961, c. 345, §§ 2, 3). He was the registered pharmacist in charge of the drug business of the store. G. L. c. 112, § 39 (as amended through St. 1953, c. 281).

We assume that the convictions constituted the store a common nuisance under G. L. c. 94, § 209 (as amended through St. 1957, c. 660, § 1).[2] There is no provision in the leases as to maintaining a nuisance or committing an unlawful act on the premises. So the defendants must look to some statute for authority to terminate. See *Commonwealth* v. *Wentworth*, 146 Mass. 36, 37. This they contend

---

[1] These liquor law convictions are not relied upon as a ground for termination of the leases. They are important only as a possible source of confusion in the testimony hereinafter discussed and as being referred to in the judge's findings.

[2] "Any store, shop, warehouse, dwelling house, building, vehicle, boat, aircraft or any place whatever, which is resorted to by narcotic drug addicts for the purpose of using narcotic drugs, or which is used for the illegal keeping or selling of the same, shall be deemed a common nuisance. No person shall keep or maintain such a common nuisance."

they find in G. L. c. 139, § 19 (as amended through St. 1934, c. 328, § 14), which reads: "If a tenant or occupant of a building or tenement, under a lawful title, uses such premises or any part thereof for the purposes of prostitution, assignation, lewdness, illegal gaming, or the illegal keeping or sale of alcoholic beverages, as defined in section one of chapter one hundred and thirty-eight, such use shall at the election of the lessor or owner annul and make void the lease or other title under which such tenant or occupant holds and, without any act of the lessor or owner, shall cause the right of possession to revert and vest in him, and he may, without process of law, make immediate entry upon the premises, or may avail himself of the [summary process] remedy provided in chapter two hundred and thirty-nine."

We cannot accept the contention. Section 19 enumerates five uses of premises which will make a lease void. The sale of harmful or narcotic drugs is not among them. While one may venture the opinion that such use is as bad as or worse than some of the specified uses, the fact remains that the Legislature has not spoken so as to include it. *General Elec. Co.* v. *Commonwealth,* 329 Mass. 661, 664. *Iannelle* v. *Fire Commr. of Boston,* 331 Mass. 250, 252–253. This omission is decisive. A penal statute must be strictly construed. *Beloin* v. *Bullett,* 310 Mass. 206, 211. Contrary to the defendants' contention, this result does not mean that § 209 "has no force or effect." By a legislative declaration of policy, various acts and conduct related to narcotic drugs are made, without resort to evidentiary proof, a common nuisance.

The defendants also argue that they are entitled to terminate the leases under G. L. c. 139, § 19, "for violations of the laws regulating the keeping and selling of alcoholic beverages as defined in G. L. c. 138, and by G. L. c. 139, § 14" (as amended through St. 1934, c. 328, § 10).[1] Our consider-

---

[1] "Every building, place or tenement which is resorted to for illegal gaming, or which is used for the illegal keeping or sale of alcoholic beverages, as defined in section one of chapter one hundred and thirty-eight, shall be deemed a common nuisance."

ation of this issue is greatly handicapped by (1) the vagueness of the testimony, all of which was elicited from the defendant Day, who was called as a witness by the plaintiffs in "rebuttal examination"; and (2) the generalized character of some of the judge's statements, which are contained in a single sentence: "I find and rule that the convictions of the . . . [plaintiff] Harry R. Roseman and his conduct with relation to the illegal sale of liquor does not afford the . . . [defendants] the election to terminate the leases, these convictions having occurred some sixteen (16) or more years ago, and a new lease having been negotiated since that time and the acceptance of rent by the . . . [defendants] after knowledge, at least in March of 1961, of illegal liquor activity on the premises."

Although the judge uses the dual expression "find and rule," it is clear that he was intending to make a finding of fact so far as a question of fact was involved. *Scullin* v. *Cities Serv. Oil Co.* 304 Mass. 75, 82. There is a problem as to what he did find, in particular as to what was meant by the findings "his conduct with relation to the illegal sale of liquor" and "after knowledge, at least in March of 1961, of illegal liquor activity on the premises." This is an appropriate case for us to supply clarifying findings of our own. *Lowell Bar Assn.* v. *Loeb,* 315 Mass. 176, 178.

The defendant Day, a doctor with an office near by, on direct examination by counsel for the plaintiffs, when asked when he first learned "about the liquor violation,"[1] testified, "after this narcotic business. . . . Maybe a week, ten days, two weeks. About a week." A couple of neighbors, whom he does not remember, told him. "There's been so many stories coming out of those drug stores, I can't remember who says them." He had not heard stories about the drug store before the drugs violation. He could not say who had told him that "there had been a liquor violation down there twelve years ago." The following then occurred: "Q. Didn't you tell your attorney . . . about

---

[1] The "liquor violation" had not been referred to in the examination of the witness.

Roseman *v.* Day.

this violation? A. I certainly did. Q. When did you tell him that? THE JUDGE: You speak of a violation? ATTORNEY FOR THE PLAINTIFFS: I'm referring to the liquor violation. THE WITNESS: I only heard of one liquor violation, and apparently there had been three or four of them. I didn't know about those other." The defendant Day's testimony up to this point we construe as referring solely to the convictions in 1949 and earlier. We shall put this testimony out of the case as did the judge.

Later in direct examination the defendant Day testified that he understood that one could go into the drug store on Sunday and have a drink at any time; and that he had been told that one could go into the Bird Pharmacy and get a drink. "I wouldn't say several years, but that's none of my business. Q. It's none of your business, is it, that he was selling or may have been selling alcoholic beverages? A. As long as I don't have kids running around the street, bothering my patients, I didn't mind. Q. It didn't bother you in the slightest? A. As long as nobody got drunk."

In recross-examination, the defendant Day testified that he understood that a person could purchase liquor in the store on Sunday. "THE JUDGE: When did they tell you this? THE WITNESS: You know, when this thing broke, it seems as though the whole place blew up. I heard more stories than I had heard in the last nine or ten years. THE JUDGE: You mean, when the narcotics violation came out, that's when you found out about the liquor violation? THE WITNESS: That's right."

On later redirect examination the defendant Day was interrogated further as to when he heard about "the liquor violation." He testified that he thought of doing something, but did not know what he could do. "Q. When did you consider doing something about it? A. When this narcotics business came up." "Q. . . . Before that time, when did you think of doing something about it. A. About a month previous; a month or two months. Q. March or February? A. I don't know. Q. The early part of '61? A. I'd say March." "THE JUDGE: What you heard about this liquor situation, was there any talk or did you hear

about how long it had been going on? THE WITNESS: No, I didn't pay much attention to it when I heard it. This fellow told me you could go in the store and have a drink any time you wanted to, and I said, 'Fine.' '' ''THE JUDGE: When did you find out that somebody had been convicted of selling liquor there? THE WITNESS: It was about a week or two after this affair.'' The witness identified two checks for $125 payable apparently to both defendants, one dated March 11, 1961, for rent for the month of March, which was deposited on an undisclosed date, and the second dated April 5 and deposited on April 7, which we infer was for rent for the month of April.

Under date of April 7, 1961, the defendants in writing notified Roseman that the ''lease on the store'' was terminated for the illegal sale of drugs. On June 13, 1961, the date the bill of complaint was filed, the defendants' counsel in writing notified Roseman that the lease dated August 3, 1949, was terminated for the illegal keeping and selling of drugs.

The defendants argue that the testimony of the defendant Day as to what he knew was binding on the plaintiffs and required a finding that such keeping and sale took place. McFaden v. Nordblom, 307 Mass. 574, 575. At least, it was evidence justifying a finding of some kind of information, and the judge seemingly found that the defendant Day had information of the matters to which he testified. The difficulty is that it is left enshrouded in haze as to how early he acquired such information. The first warrant on a drug complaint was issued on April 6, 1961, and was read in open court on the following day. But he had earlier information. Manifestly, as the judge found, he had information of some sort in the early part of March, 1961, nearly a month prior to the ''narcotics business.'' On the defendant Day's conflicting testimony, a finding that he had information two months previous could be made.

The evidence of recent liquor law violation was hearsay and flimsy. It is open to doubt whether a finding of such a violation dissociated from a finding of waiver and made on the testimony would be allowed to stand. What the

judge found is susceptible of meaning that any violations, of which either defendant had information, were waived. In any event, we make that finding.

"Waiver is the intentional relinquishment of a known right." *Nashua River Paper Co.* v. *Lindsay,* 242 Mass. 206, 208. Waiver can be based upon the defendant Day's indifference to the reports of liquor violations, upon the notices of termination which do not rely on such violations, and upon accepting at least one check for rent after receipt of such information.

The final decree is affirmed. No costs are allowed.

*So ordered.*