NEW BEDFORD HOUSING AUTHORITY vs. ELBA OLAN.[1]

No. 98-P-371.

Bristol. January 18, 2000. - October 6, 2000.

Present: PERRETTA, KASS, & LENK, JJ.

Further appellate review granted, 432 Mass. 1111 (2000).

*Housing Authority. Landlord and Tenant,* Eviction. *Constitutional Law,* Jury,
Search and seizure. *Statute,* Construction. *Jury and Jurors. Search and
Seizure,* Exigent circumstances. *Federal Preemption. Due Process of Law,*
Notice.

Discussion of G. L. c. 139, § 19, and the "common nuisances" and other acts
specified therein that are grounds for a landlord to void a tenant's lease.
[194-196]
This court concluded that, in the circumstances, a tenant in a public housing
apartment has a right to a jury trial on the landlord's request that the tenant
be evicted under G. L. c. 139, § 19. [196-203]
A tenant whom a housing authority sought to evict under G. L. c. 139, § 19,
demonstrated no prejudice from the notice given; further, the Com-
monwealth's notice provisions did not conflict with any applicable Federal
statute or regulations so as to be preempted by Federal law. [205-206]

CIVIL ACTION commenced in the Southeast Division of the
Housing Court Department on July 14, 1997.

The case was heard by *Manuel Kyriakakis,* J.

*Christopher R. Whittingham* for the defendant.

*Martin J. Rooney* for the plaintiff.

*Richard M.W. Bauer & Judith Liben,* for Massachusetts Union
of Public Housing Tenants, amicus curiae, submitted a brief.

LENK, J. Elba Olan appeals from a Housing Court judge's
order, issued pursuant to § 19 of the common nuisance statute,
G. L. c. 139, requiring that she and her family vacate their
public housing apartment. Although Olan has raised a number
of issues on appeal, her chief contentions are that (1) she was
deprived of her State constitutional right to a jury trial; (2) the

---

[1]We acknowledge the brief filed as amicus curiae by the Massachusetts
Union of Public Housing Tenants.

judge erred as matter of law in concluding that the plaintiff had satisfied one of the elements of c. 139, § 19; and (3) she was given inadequate notice of the proceedings in violation of Federal and State law. We reverse.

*Facts and procedural history.* We recite the facts in some detail, recounting the evidence credited and the facts found by the trial judge, as well as certain additional evidence of record. This controversy has its genesis in events that took place on the night of July 10, 1997. Elba Olan and her four teenage children[2] lived at 10 Monroe Drive in the Presidential Heights public housing project (project), in New Bedford. This federally-subsidized project is owned and operated by the plaintiff New Bedford Housing Authority (Authority). Olan rented a four-bedroom unit in the project and had lived there with her family for approximately three years. There was no history of violence or of any other problems at the project involving the Olan family.

At approximately 11 P.M., two New Bedford police officers, Officers Natinho and Pettiford, were dispatched in their police cruiser to a reported disturbance at 39 Hicks Street in New Bedford (not the project).[3] Upon their arrival, the officers saw a white pickup truck leaving the scene without its lights on and driving over the street curb. The driver of the truck refused to pull over for the police. The officers testified that they followed the truck, which was proceeding erratically and at a rate of speed moderately above the speed limit, to the project where it stopped in front of 45 Monroe Drive. The patrol car struck the back of the truck when the latter stopped and the truck's driver and passenger fled the vehicle. The officers gave chase to the driver, but while doing so, Officer Natinho fell and Officer Pettiford stopped briefly to check on him.

Meanwhile, Officer Ramos, another New Bedford police officer who lived in the project at 41 Monroe Drive, had observed the accident between the vehicles and joined in the chase of the driver. Officer Ramos was in uniform at that time as he was about to go on duty. He observed an individual run into 10

---

[2]The names and ages of the Olan children at the time were Hector, 18; Elba, 16; Jacinto, 15; and Jacqueline, 14. (Although the middle daughter's name is spelled "Yanitca" in the complaint, we adopt the spelling as found in the transcripts, "Jacinto.")

[3]Officer Pettiford was in uniform, but the trial testimony does not clearly indicate whether Officer Natinho was in uniform or plainclothes.

Monroe Drive, Olan's apartment. The apartment door was open
and Olan's daughters Jacinto, Elba and Jacqueline were sitting
outside. Officer Ramos ran into the Olan unit and up the stairs
to the second floor without announcing himself to the occupants
or obtaining their consent to enter. When he reached the second-
floor landing, he attempted to open a locked bedroom door. The
other two police officers, after making a similar nonconsensual
entry, joined Officer Ramos on the landing, the size of which
Officer Pettiford estimated as approximately five feet by three
feet.

Olan was in her second-floor bedroom, writing a letter, with
the door slightly ajar.[4] She saw a uniformed officer outside her
son Hector's bedroom door and began asking "what's hap-
pened" in Spanish, the only language she understood. Upon
leaving her bedroom, Olan saw three police officers in the
hallway, one of whom was wearing civilian clothes. Her
daughters Jacinto and Elba also joined the group on the landing.[5]
At his mother's request, Olan's son Hector opened his locked
bedroom door. The officers entered the room and found an
individual named Francisco Miranda hiding in the bedroom
closet.[6] Both Hector Olan and Miranda were placed under arrest
— the record is not clear on what charges — and they were
taken from the apartment.

While testimony as to the next series of events differed
widely, there is no dispute that quite a commotion ensued. The
judge, crediting the officers' testimony, found that Olan and her
daughters refused to cooperate with the officers on the second
floor (who now numbered at least four), and that the Olans
became hysterical and abusive, with one of Olan's daughters
throwing a deck of cards at the officers. The officers testified
that Olan began flailing her arms, screaming, and striking the

---

[4]The judge found that approximately one-half hour had elapsed from the
time the officers originally were dispatched to Hicks Street.

[5]Olan and her daughters testified that they continued to query the officers in
Spanish as to what was happening but received no answer from them, although
the Olans knew that Officer Ramos spoke Spanish. One officer testified that
the daughters were speaking English. All of the Olan family members who
testified at the hearing required the services of a court translator.

[6]Miranda is not a member of the Olan family. His relationship with the
Olans, if any, is not disclosed in the record.

officers, and so they placed her under arrest.[7] In contrast, the Olans testified that it was the police who became abusive and that the officers hit and kicked the women. One daughter testified that the police "acted like [her mother] was an animal. They didn't grab her in a normal way." When Officer Pettiford, a female officer, escorted Olan downstairs, both fell down the staircase and landed together at the bottom. Although trial testimony on the point diverged again, the judge found that one of the daughters pushed Officer Pettiford from behind.

By this time, Olan's other son Ramon and several other male individuals had entered the downstairs area.[8] Officer Pettiford testified that these individuals verbally and physically threatened the officers after she and Olan tumbled down the stairs. Fearing that she and her fellow officers were in danger, she sprayed mace to repel the group of men, who then fled. Olan also was sprayed with mace in the process.

Meanwhile, a crowd had gathered outside Olan's unit. The testimony was in conflict again, but the judge credited estimates by two officers that seventy-five to 100 people were on hand and that a "near riot situation" was in progress, with individuals shouting and throwing rocks at the officers. The judge also found that Olan, who was placed face down on the ground outside, and her family members continued to resist the police. Three State troopers and twelve city officers eventually arrived on the scene. Paramedics were called as Olan exhibited symptoms of a seizure. However, the judge found that the situation ended in a "somewhat peaceful manner" after the Olan family was taken to the police station.

Olan, her daughters Jacinto and Elba, and her son Hector were arrested and charged with assault and battery on the police

[7]The judge's findings did not incorporate the undisputed fact that Olan suffers from epilepsy and that she requires medication to control her illness. Olan's daughters testified extensively that they and their brothers became very upset about their mother's condition after Olan became distressed over the officers' presence in her home and then fell down the stairs. Officers Natinho and Pettiford testified that they were told by Olan's children and the crowd that Olan had a "heart problem" and that she might experience a seizure. The testimony was conflicting as to whether the police officers attempted to prevent Jacqueline Olan from administering medication to her mother before the paramedics arrived; the judge made no findings as to this issue.

[8]Ramon Olan was not a tenant or member of the Olan household at 10 Monroe Drive.

officers, as well as with resisting arrest and disturbing the peace.[9] After being arraigned and released, Olan was treated at the hospital for injuries. The judge found that both the officers and the Olans suffered abrasions and bruises from the altercation.

The next day, July 11, the Authority served Olan with a copy of a complaint alleging a violation of G. L. c. 139, § 19. Section 19, which is set forth in greater detail below, permits a landlord to seek a court order for the removal of a tenant who has maintained a nuisance on the premises; in Olan's case, the alleged nuisance was the commission of an act which would constitute a crime against any person who is legally present on the housing authority premises. The Authority alleged that Olan and her family members had committed assault and battery on the police officers, who were legally present in her home. In its motion for preliminary injunction, the Authority also alleged that Olan had violated the Authority's "one strike policy"[10] as well as the provisions of her lease. The Authority requested relief in the form of both a declaratory judgment voiding Olan's lease and an order that she and her family vacate the premises. Three days later, the Authority filed this action. Olan answered the complaint and requested a jury trial.

The judge originally scheduled the case for trial on August 15, 1997, and ordered discovery to be completed by that date. However, on July 25, 1997, the Authority moved for a speedy trial and streamlined discovery, requesting that Olan's discovery be limited to the police reports and police testimony. The judge granted both motions at a hearing on July 28, and rescheduled the hearing for August 1. Olan filed a motion to dismiss the complaint, a motion in limine to suppress evidence on the grounds that the police entry was unlawful, and a motion for a continuance. All of Olan's motions were denied by the judge. The judge ruled that, since the proceedings concerned an emergency action and were equitable in nature, no jury trial was required. Olan's request for interlocutory relief was denied on July 30. The hearing commenced on August 1, then adjourned for one week of vacation, and resumed on August 11. Trial was

---

[9]Neither the record nor the parties' briefs indicate the status of those criminal charges. However, it is undisputed that no one was ever charged in connection with the original traffic violation that brought the police into Olan's apartment.

[10]The one strike policy was not referred to any further at trial or by the judge in his findings.

completed on August 14, and the judge took the matter under advisement.

Judgment was rendered in favor of the Authority on August 21, 1997, and the Olans were ordered to vacate the premises. In order to prevail under G. L. c. 139, § 19, as amended by St. 1995, c. 179, § 13, the Authority was required to prove that (1) the Olans were either tenants of the Authority or household members of a tenant; (2) the Olans had committed acts "which would constitute a crime involving the use or threatened use of force or violence"; and (3) the Olans committed those acts against either a housing authority employee or one who was legally present on the project's premises. The first element was undisputed. On the second, the judge concluded that the Olans' conduct was "not justified" and a violation of § 19. As to the third element, the judge concluded that the police were lawfully present in the Olans' apartment despite not having a warrant. He found that exigent circumstances were presented by the fleeing driver as well as the possibility of the suspect's escape. Pursuant to § 19, the judge thereby ordered the cancellation of Olan's lease. In addition, the judge determined that the Olans' conduct was in clear violation of the lease provisions requiring that tenants live in a "peaceful way," and thus constituted sufficient grounds for eviction. Olan's motion for a stay pending appeal was denied, as was her interlocutory appeal from that denial.

On October 17, 1997, Olan filed a motion to vacate the judgment pursuant to Mass.R.Civ.P. 60(b), 365 Mass. 828 (1974). Olan contended that the Authority failed to provide her written notice of the termination of her public housing tenancy as required by Federal law, and that such Federal notice provisions preempted any parallel State regulations. The judge denied this motion and issued an execution on the judgment as requested by the Authority. Olan was ordered to vacate the premises and she and her family subsequently did so.

On appeal, Olan maintains that (1) she was entitled to a jury trial pursuant to art. 12 and 15 of the Massachusetts Declaration of Rights; (2) G. L. c. 139, § 19, violates the equal protection clause of both the State and Federal Constitutions; (3) the judge erred in concluding that the police officers were legally on the premises; (4) the Authority failed to give her proper notice of the proceedings against her in violation of Federal and State law; and (5) a number of the judge's discovery, evidentiary, and

scheduling orders were abuses of discretion that deprived her of a fair trial. We review each in turn.[11]

1. *Entitlement to a jury trial in c. 139, § 19, proceedings.* Olan's contention that she was entitled to a jury trial before she could be evicted under G. L. c. 139, § 19, appears to be one of first impression. She bases her claim on arts. 12 and 15 of the Massachusetts Declaration of Rights. We turn first to the pertinent language and background of the statute before undertaking our analysis of the State constitutional jury trial claims.

a. *Section 19 of G. L. c. 139, the common nuisance statute.*

General Laws c. 139, § 19, permits a housing authority to void a tenant's lease when a tenant or member of the tenant's household commits certain acts of violence. Section 19 states, in relevant part:

> "If a tenant or household member of a housing authority or federal or state assisted housing commits an act or acts which would constitute a crime involving the use or threatened use of force or violence against the person of an employee of the housing authority[12] . . . or against any person while such person is legally present on the

---

[11]Although the point was not raised by the Authority, it is appropriate that we nonetheless consider whether the issues in Olan's case have been rendered moot by her eviction. Olan's appeal is not moot, for the reason, if no other, that she appears to retain a personal stake in the outcome of this case, see *Bronstein* v. *Board of Registration in Optometry*, 403 Mass. 621, 627 (1988), insofar as she would have the right to return to comparable public housing should she prevail in this litigation.

Even were we to assume that the issues in Olan's case were moot due to her eviction, an exception to the mootness doctrine is that an issue is "capable of repetition, yet evading review." *Metros* v. *Secretary of the Commonwealth*, 396 Mass. 156, 159 (1985), quoting from *Southern Pac. Terminal Co.* v. *ICC*, 219 U.S. 498, 515 (1911). If proceedings conducted pursuant to G. L. c. 139, § 19, were considered moot in every case in which a tenant already had been evicted, appellate review could not be obtained in any similar factual circumstances before the recurring question would again be moot. See *Singer Friedlander Corp.* v. *State Lottery Commn.*, 423 Mass. 562, 563 (1996). Therefore, we may exercise our discretion to decide the issues raised by Olan on appeal. See *Metros, supra* at 159.

[12]The Authority's complaint alleged that "[t]he police officers involved in this incident were acting both in their official capacity as Police Officers and an [*sic*] employees of the New Bedford Housing Authority, being paid by the New Bedford Housing Authority as Community Police. The officers were acting only in one or the other capacity." At trial, an Officer Silva who was

premises . . . , such use or conduct shall, at the election of the lessor or owner, annul and make void the lease . . . and without any act of the lessor or owner shall cause the right of possession to revert and vest in him, and the lessor or owner may seek an order requiring the tenant to vacate the premises or may avail himself of the remedy provided in chapter two hundred and thirty-nine. If the lessor or owner is entitled to relief pursuant to this section, such lessor or owner may seek declaratory judgment of his rights hereunder in the district, superior or housing court, which may grant appropriate equitable relief, including both preliminary and permanent injunctions . . . , and in connection therewith may order issuance of an execution for possession of any such premises."

Since c. 139, § 19, was first codified in R.S. 1836, c. 130, § 9, the Legislature has steadily broadened the number of common nuisances that can trigger a public or private landlord's right to void a lease.[13,14] The statute was most recently amended in 1992 and 1995. The 1992 amendment permitted the eviction

present during the events at issue testified that he was on duty with the police department and assigned to the Housing Authority as a supervisor. He stated that "[t]hey [the Authority] pay the city and the city pays me." The judge made no findings as to whether Officer Silva was acting in his capacity as a city police officer or as an Authority employee.

[13]Other than the specific provisions of c. 139, § 19, referring to public housing tenants (quoted in the text), the remaining "common nuisances" specified in § 19 are grounds for voiding the lease between any landlord and any tenant, not just public landlords and tenants. The Revised Statutes of 1836 voided the lease only of persons who kept "a house of ill fame, resorted to for the purpose of prostitution or lewdness." To this, St. 1855, c. 405, §§ 1 and 3, added "illegal gaming, or . . . the illegal sale or keeping of intoxicating liquors." Section 14 of St. 1982, c. 373, expanded coverage to those "habitually serv[ing alcoholic beverages] to persons who are intoxicated, or . . . to persons whom the operators of said premises know or have reason to know will operate a motor vehicle under the influence of intoxicating liquor." Three years later, by St. 1985, c. 421, § 3, the Legislature added to the list "the illegal keeping, sale or manufacture of controlled substances." Lastly, by St. 1995, c. 179, § 13, the list was expanded once more to include the "illegal keeping of a weapon . . . or possession or use of an explosive or incendiary device." See the text, infra, for a discussion of particular amendments affecting public housing tenants.

[14]"At common law public nuisance came to cover a large, miscellaneous and diversified group of minor criminal offenses, all of which involved some interference with the interests of the community at large." Leary v. Boston, 20 Mass. App. Ct. 605, 609 n.6 (1985), quoting from Restatement (Second) of Torts § 821B comment b (1979). Public nuisances include interference with

of public housing tenants who had been convicted of assault and battery on an employee of a housing authority.[15] In 1995, § 19 was rewritten as quoted above, to permit a housing authority to seek the eviction of a public housing tenant who has engaged in conduct that would constitute a crime of force or violence or the threat of same; a conviction is no longer a prerequisite. In addition, the quoted provisions allowing a judge to issue "appropriate equitable relief, including both preliminary and permanent injunctions," were added in 1995.[16]

b. *The art. 12 right to a jury trial.* Olan maintains that the provisions of c. 139, § 19, entitle her to a jury trial under art. 12 of the Massachusetts Declaration of Rights. Article 12 states, in relevant part, "[N]o subject shall be . . . deprived of his property . . . but by the judgment of his peers, or the law of

---

the public health, the public morals, the public comfort, the public convenience, and the public safety. *Id.* For example, at common law, such nuisances have included "riotous commotion and excessively unreasonable noise," see *Commonwealth* v. *A Juvenile,* 368 Mass. 580, 597 (1975); obstruction of a public way, see *Stop & Shop Cos.* v. *Fisher,* 387 Mass. 889, 894 (1983); obstructing a watercourse so as to cause water to flow over a highway, see *Dartmouth* v. *Silva,* 325 Mass. 401, 404 (1950); and leaving personal property on a public street, see *Row* v. *Home Sav. Bank,* 306 Mass. 522, 526 (1940).

The Legislature may also "provide that particular uses of property constitute public or common nuisances and may make that conduct subject to injunction without proof that, in the particular case, the conduct caused actual harm to public or private interests." *Commonwealth* v. *United Food Corp.,* 374 Mass. 765, 778-779 (1978). In addition to c. 139, § 19, other statutes referring to public or common nuisances include c. 93D, § 4 (any outdoor advertising that violates law is deemed a public nuisance); c. 138, § 60 (illegal keeping of alcoholic beverages for sale a public nuisance); c. 139, § 1 (burnt, dilapidated, or dangerous building may be adjudged a common nuisance by a municipality); c. 140, § 137C (dog kennel holding vicious dogs or dogs that bark excessively a public nuisance); c. 140, § 119 (engine or furnace erected or used without proper license a common nuisance); c. 143, § 22 (article placed on fire escape or outside exit of building a common nuisance); c. 144, § 2 (public nuisance includes building which is overcrowded or without adequate exits); c. 147, § 45 (activities related to illegal boxing matches, such as advertising or selling tickets, are common nuisances); c. 252, § 5B (mosquito-infested area may constitute public nuisance); and c. 271, § 20 (paraphernalia used for illegal gambling a common nuisance).

[15]See St. 1992, c. 133, § 495.

[16]Section 19 previously permitted the landlord to make immediate entry upon the premises without legal process.

the land."[17] Olan argues that her apartment was a property interest protected by art. 12, and therefore, the judge's denial of her request for a jury trial in these proceedings violated her State constitutional rights.

As a threshold matter, we note that c. 139, § 19, makes no express mention of jury trials, but such legislative silence, by itself, does not foreclose the possibility. See *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. 220, 225-228 (1994) (despite absence of specific statutory language, plaintiff entitled to jury trial on State claims for gender discrimination by employer, wage discrimination, and equal rights). See also *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 655 (1996) (jury trial right extended to all discrimination claims under G. L. c. 151B, § 4, including claims for unlawful retaliation). Section 19 of c. 139 refers to the relief "the court" may grant. Included in the range of possible relief is the entry of a declaratory judgment. *Id.* Actions for declaratory judgment can, of course, be heard by a jury if there are triable issues of fact and the judge determines that a jury traditionally would have determined those issues. See c. 231A, § 1.[18] In any event, even if the language of § 19 were to be read as a legislative effort to limit litigants to non-jury trials, the Legislature cannot by enactment divest litigants of their constitutional jury trial rights. See *Commonwealth* v. *One 1972 Chevrolet Van*, 385 Mass. 198, 203 (1982).

In determining whether G. L. c. 139, § 19, requires a jury trial under circumstances such as these, we must first determine whether Olan faced a deprivation of her property. There is little question that Olan had a protectable property interest at stake. "As a general rule, when State or Federal law entitles an

---

[17]"Although art. 12 deals with many matters related to the rights of criminals, it is not exclusively concerned with criminal matters. For example, art. 12 sets forth principles of due process of law applicable to civil, as well as criminal, actions in both a procedural . . . and a substantive sense." *Commonwealth* v. *One 1972 Chevrolet Van*, 385 Mass. 198, 199-200 n.1 (1982) (citations omitted).

[18]General Laws c. 231A, § 1, states, in relevant part, "When a declaration of right, or the granting of further relief based thereon, shall involve the determination of issues of fact triable by a jury as of right and as to which a jury trial is duly claimed by the party entitled thereto, or issues which the court, in accordance with the practice of courts of equity, considers should be tried by a jury, such issues may be submitted to a jury . . . ." Because of the result we reach, we need not determine whether an evaluation of the Olans' conduct under § 19 would be in accordance with the practice of courts of equity.

individual meeting certain eligibility criteria to the receipt of a State or federally funded benefit, the individual has a property interest in the benefit." *Madera* v. *Secretary of the Executive Office of Communities & Dev.*, 418 Mass. 452, 459, 461-462 (1994) (plaintiff held to have constitutionally protected property interest in eligibility for public housing). See *Greene* v. *Lindsey*, 456 U.S. 444, 450-451 (1982) (right to continued residence in public housing a significant property interest).

The next inquiry under art. 12 is whether the statute is punitive or remedial, the former entitling an individual to trial by jury. Otherwise put, while the future use of property for the illegal maintenance of a nuisance may be enjoined without the involvement of a jury, the act(s) of having maintained a nuisance may not be punished without a jury trial when one is requested. Olan argues that because the proceedings brought under c. 139, § 19, completely deprived her of her property and did not merely enjoin the future maintenance of a nuisance, the statute is punitive. The Authority, however, maintains that no jury trial is required because § 19 is merely remedial, as it simply permits the abatement of a common nuisance by eviction.

In *Commonwealth* v. *United Food Corp.*, 374 Mass. 765 (1978), the court considered the lack of availability of a jury trial in a common nuisance proceeding. There, the district attorney brought an action pursuant to the applicable provisions of c. 139 then in effect, §§ 4-13 and 19-20, and the defendants were found to have maintained a brothel in their nightclub, a common nuisance under c. 139. *Id.* at 766. As required by the statute, the judge permanently enjoined the defendants from maintaining the nuisance, ordered the premises closed for one year, and ordered the sheriff to take possession of the premises and to sell all of the defendants' moveable property that had been used to maintain the nuisance. *Id.* at 766 & n.1, 779-780.

While holding that "an injunction against the future maintenance of a public nuisance may properly be entered without the involvement of a jury," *id.* at 778, the court also held that, unless necessary to abate the nuisance, the orders to close the defendants' premises and sell their property would be "purely punitive," thereby triggering the art. 12 right to a jury trial before such severable[19] remedies could be imposed. *Id.* at

---

[19]For a discussion of the severability issue, see *Commonwealth* v. *One 1972 Chevrolet Van*, 385 Mass. at 200.

780-781.[20] Thus, if a portion of a statutory remedy to abate a nuisance is both severable from the other remedies and solely punitive, art. 12 entitles the defendant to a jury trial before that punitive remedy can be imposed, in contrast to the severable, nonpunitive remedy of simply abating the nuisance. *Id.* at 779.

Four years later, in *Commonwealth* v. *One 1972 Chevrolet Van*, 385 Mass. 198 (1982), the court again considered the applicability of art. 12, but this time to a nonseverable statutory remedy. The Commonwealth sought the statutory forfeiture of a vehicle used to facilitate the distribution of illegal drugs, and the van owner's motion for a jury trial was denied. *Id.* at 199. The court contrasted the forfeiture proceedings with nuisance abatement, observing:

> "We have not regarded a jury trial to be mandated by art. 12 when a proceeding is brought to abate a nuisance. . . . [A]lthough it usually has unseverable punitive side effects, nuisance abatement is predominantly remedial in character. A nuisance proceeding, which merely limits the owner's use of his property by enjoining future illegal uses, is, however, different from the forfeiture in the case at bar, which would permanently deprive [the owner] of his van."

*Id.* at 199-200 (citation omitted). The court then compared the forfeiture statute before it to the nuisance proceedings in *United Food*, and held that the forfeiture statute was neither clearly remedial nor solely punitive. 385 Mass. at 200-201. "Forfeiture is punitive because it results in total loss of the property. But it is often also remedial, for like a proceeding in equity to abate a nuisance, it restrains further illegal use of the forfeited item." *Id.* at 201 (footnote omitted).

Because of the nonseverable nature of the remedy, see *id.* at 200 n.2, and because "the two aspects [punitive and remedial effects] are likely to be involved in varying degrees in each forfeiture proceeding," the issue could not be resolved without considering the kind of property forfeited. *Id.* at 201. The court observed that forfeiture of a common vehicle is unlike the forfeiture either of items that are the subject of the crime itself,

---

[20]The court cured the statute's constitutional problem by mandating that the judge have discretion to fashion a remedy that would achieve the statutory goals of abating the nuisance and recovering the costs of the proceedings. *United Food*, 374 Mass. at 780-781.

such as drugs, or of items such as burglary tools, which are "special instruments tailored to the commission of crimes." *Id.* When a vehicle has no distinguishing qualities that make it "particularly suitable" for committing crimes, the punishment element is more dominant and the preventative element "relatively insignificant, and often nonexistent." *Id.* Therefore, the court held that the statutory forfeiture proceedings were a deprivation of property within the meaning of art. 12 and a jury trial should have been made available to the van's owner. *Id.* at 202.[21]

The question before us, then, is whether the eviction remedy of G. L. c. 139, § 19, as applied to Olan, is punitive or remedial, severably or not. The case law is inconclusive. In *Roseman* v. *Day*, 345 Mass. 93, 95 (1962), § 19 was described as a "penal statute." More recently, in *Boston Hous. Authy.* v. *Guirola*, 410 Mass. 820, 825-826 (1991), the court stated, "Although the text of G. L. c. 139, § 19, suggests that its purpose is not punitive but curative — the removal of a nuisance — the statute's impact on the ousted tenant is similar to that of [a] forfeiture proceeding."

We think that the eviction remedy in c. 139, § 19, is best described as being both "solely punitive" and unseverable. Olan was not simply enjoined from maintaining the complained of nuisance. Nor did her eviction merely limit her use of the property. To the contrary, the eviction permanently deprived Olan of the use of her apartment, a result comparable to the "solely punitive" closing and sale remedies in *United Food*, 374 Mass. at 779.

Insofar as Olan's eviction can be said to have the dual purpose of abating a nuisance and imposing a penalty, it is also comparable in that regard to the unseverable forfeiture proceedings in *Chevrolet Van*. To be sure, G. L. c. 139, § 19, permits the court upon a landlord's request to grant "appropriate equitable relief," and this remedy, to the extent that it merely enjoins

---

[21]Contrast *Doherty* v. *Retirement Bd. of Medford*, 425 Mass. 130, 136-137 (1997) (jury trial not required by art. 12 before ex-police officer ordered to forfeit retirement benefits which did not exceed amount of city funds he misappropriated; statute not punitive as relief solely to provide restitution). Cf. *Commonwealth* v. *Fourteen Thousand Two Hundred Dollars*, 421 Mass. 1, 6-7 (1995) (statute to recover money linked to illegal drug sales not punitive; statute preventative when used to recover money intended to be used to purchase illegal drugs, and remedial when used to recover proceeds of illegal drug sales).

future maintenance of the nuisance, appears not to implicate the right to a jury trial. The statute, however, permits more than this, and when the landlord requests and the judge orders the tenant evicted,[22] a remedy which in truth may well be the only realistic means of addressing the problem in some circumstances, see *Spence* v. *Gormley*, 387 Mass. 258, 271 (1982), the matter is otherwise. The eviction remedy, like forfeiture, is an "all or nothing proceeding." *Chevrolet Van*, 385 Mass. at 200 n.2. While the evicted tenant will no longer be able to use her apartment to maintain the complained of nuisance, that will be so only because the tenant will have no use of her apartment at all. The total loss of use is an unseverable and punitive aspect of the eviction remedy. *Id*.

In view of this, we must next consider the type of property at issue. Olan's apartment, like the vehicle in *Chevrolet Van*, *supra* at 201, had no "particular suitability" to the altercation which took place there with the police officers.[23] Neither was Olan's possession of the premises a crime itself, nor the apartment "tailored" to the incident itself. *Id*. Thus, in this respect, the punishment element dominates the preventative element of c. 139, § 19.

Accordingly, G. L. c. 139, § 19, as applied to Olan, is a punitive statute and, in these circumstances, the remedy sought required a jury trial upon Olan's request.[24] In so concluding, we do not in any way minimize the "strong interest" that both

[22]As noted above, c. 139, § 19, permits a landlord to pursue either an order for eviction under § 19, or summary process proceedings pursuant to c. 239. In *Kargman* v. *Dustin*, 5 Mass. App. Ct. 101, 108 (1977), which involved G. L. c. 239 summary process proceedings against tenants of a federally-subsidized housing development who refused to pay a rent increase, we observed that "Massachusetts has long accorded tenants both a constitutional and a statutory right to a jury trial in eviction cases." In the present case, the Authority sought relief only under G. L. c. 139, § 19.

[23]We reject the Authority's characterization of Olan's apartment as the "launching platform" for the Olans' conduct. This terminology implies that the Olans' conduct was somehow staged and planned in advance of the events. Nothing in the evidence supports this view. However, we do not foreclose the possibility that in different circumstances an apartment could be so fitted as to be "particularly suited" to the complained of conduct.

[24]In light of this, we do not reach Olan's argument that she was entitled to a jury trial under art. 15 of the Massachusetts Declaration of Rights, which states, in relevant part, "In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has heretofore been other ways used and practised, the parties have a right to a trial by jury; and this method of procedure shall be held sacred . . . ." Nor need we ad-

housing authorities and housing authority tenants have "in [the] effective use of available measures to combat the terrifying incidence of violence in . . . housing projects." *Spence* v. *Gormley*, 387 Mass. at 276. We are mindful that the 1995 amendments to § 19 were designed to increase safety in public housing, and recognize that there is a compelling need to remove expeditiously tenants who pose a danger to other tenants and to housing authority employees. Neither the Legislature nor a housing authority is, of course, required to choose the "best or gentlest of methods to achieve the objective of safe housing." *Id.* at 271. By the same token, however, we must also recognize that the very same legislation was designed to increase the accessibility of public housing,[25] and that "[a] public housing tenancy is also of great personal importance to the tenant and her family, who may have nowhere else to turn." *Id.* at 275.

The gravity of each of these important interests underscores the significance of the right to trial by a jury of one's peers in cases such as these. The fact-finding nature of the jury system is particularly relevant, where, as here, the facts were vigorously contested and credibility determinations were key. "The jury system, as the 'sacred' method for resolving factual disputes, is the most important means by which laypersons can participate in and understand the legal system." *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. at 222, citing *Commonwealth* v. *Canon*, 373 Mass. 494, 516 (1977), cert. denied, 435 U.S. 933 (1978). "Jurors bring to a case their common sense and community values; their 'very inexperience is an asset because it secures a fresh perception of each trial, avoiding the stereotypes said to infect the judicial eye.' " *Dalis, supra* at 222, quoting from *Parklane Hosiery Co.* v. *Shore*, 439 U.S. 322, 355 (1979) (Rehnquist, J., dissenting).

Moreover, from a practical standpoint, we see no reason why a jury proceeding cannot be an expedited proceeding. After all, jury trials are provided in G. L. c. 239 summary process eviction proceedings, see Rule 8 of the Uniform Summary Process Rules (1980), which are, as the nomenclature suggests, expedited proceedings. While bench trials may in some instances prove speedier, juries need not write findings of fact

---

dress Olan's argument that the Legislature's failure to provide a jury trial to public housing tenants in G. L. c. 139, § 19, proceedings violates the right of such tenants to equal protection under the Federal and State Constitutions.

[25]See, e.g., St. 1995, c. 179, § 11.

which often delay civil bench trials. The arguably quicker bench trial may be what many litigants in any event choose, as they do at present under G. L. c. 239. But for those litigants who elect a jury trial, the interests of expediency pale in comparison with the vital systemic interests at stake.

2. *The police officers' presence in Olan's home.* Olan next contends that the judge erred in concluding that the police officers were "legally present" in her home. She argues that the officers violated the Fourth Amendment to the Federal Constitution because they entered her home without a warrant and thus, because they were not lawfully present, the Authority could not prove one of the statutory elements needed to evict her under c. 139, § 19. We need not reach this issue since, in a civil proceeding tried before a jury, the question of whether the police are lawfully present is a matter for the jury to decide. We discuss it briefly, however, for it may arise at any new trial.

When a plaintiff claims a Fourth Amendment violation in a civil action, an analysis of whether the police are lawfully present is no different than in the criminal context. See *Tyree v. Keane,* 400 Mass. 1, 7-8 (1987) (plaintiff brought civil rights claims under 42 U.S.C. § 1983 and Massachusetts Civil Rights Act for unlawful police search of apartment). In both criminal and civil proceedings, a warrantless search by the police is per se unlawful unless the police can rely on one of the " 'specifically established and well-delineated exceptions' to justify the search." *Id.* at 8. See *Selectmen of Framingham v. Municipal Ct. of Boston,* 373 Mass. 783, 785 (1977); *Pasqualone v. Gately,* 422 Mass. 398, 401-402 (1996). In both criminal and civil proceedings, the burden of proof is on the government, here, the Authority, to justify the warrantless search. *Tyree v. Keane, supra* at 7.

The judge concluded at trial that, although the officers' entry into the Olans' home was warrantless, it was nonetheless justified by the exigent circumstances exception. See *Commonwealth v. Skea,* 18 Mass. App. Ct. 685, 694 (1984). However, in a civil jury case, unlike its criminal counterpart, we are persuaded by the reasoning of the Third and Sixth Circuits that the determination of whether exigent circumstances exist is a matter for the jury, as long as disputed facts are present, as here.[26] See *Sharrar v. Felsing,* 128 F.3d 810, 820 (3d Cir. 1997); *Hancock v. Dodson,* 958 F.2d 1367, 1375 (6th Cir. 1992).

---

[26]A warrantless search based on exigent circumstances also requires the existence of probable cause. See *Commonwealth v. Pietrass,* 392 Mass. 892,

We observe, as well, that at any new jury trial, the other elements of c. 139, § 19, decided by the judge at the first trial, would also be submitted to the jury. Of course, the trial judge must instruct the jury on the applicable law and the jury's role in applying the law to the facts as they find them. See *Commonwealth* v. *McDuffee*, 379 Mass. 353, 365 (1979); *Commonwealth* v. *Perez*, 390 Mass. 308, 319 (1983).

Hence, pursuant to § 19, in addition to proving that the police were lawfully present, the Authority must also prove that the Olans were either tenants or household members and that the acts they committed "constitute[d] a crime involving the use or threatened use of force or violence."[27] The Authority's allegation that the Olans committed acts that constituted the crime of assault and battery requires a fact-finder in a c. 139, § 19, proceeding to conduct the same evaluation of the Olans' conduct that a fact-finder would be required to conduct in a criminal proceeding.[28] By statute, issues of fact in criminal cases must be tried by a jury. See G. L. c. 278, § 2 ("[i]ssues of fact . . . shall . . . be tried by a jury . . . unless the person indicted . . . elects to be tried by the court").[29]

3. *Lack of notice.* Olan next argues that the Authority failed

---

897 (1984). The judge here made no findings concerning probable cause. However, in the civil context, probable cause is also a matter for the jury if facts are disputed. See *Lewis* v. *United States Ct. of Appeals, First Circuit*, 944 F.2d 949, 952 (1st Cir. 1991) (probable cause a matter for the jury in claim pursuant to 42 U.S.C. §§ 1983, 1985, and 1988). This is due to the fact that the inquiry into the existence of probable cause is a predominantly factual one. See *Moore* v. *Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994). See also *Santiago* v. *Fenton*, 891 F.2d 373, 384 (1st Cir. 1989).

[27]It is undisputed that the Olans were tenants and household members. However, the Authority's complaint also alleged that the Olans had committed an assault on a public housing authority employee. At trial, Officer Silva testified that he was such an employee, but his testimony lacks clarity on the point and the judge made no findings on this matter. At a new trial, the jury would resolve the factual issue whether each of the officers present, including Officer Silva, was an employee of the Authority, as well as the issue of whether he or she, in whatever capacity, was legally present in the apartment.

[28]Assault and battery is a criminal act pursuant to G. L. c. 265, § 13A. See *Commonwealth* v. *Montes*, 49 Mass. App. Ct. 789 (2000), which also involved an altercation between police officers and family members both inside and outside the family's home. In *Montes*, police officers pursued an individual suspected of committing a felony into his family's house, after which a melee ensued between the officers and the defendants, all of whom were related to the suspect. *Id.* at 790-791. We affirmed the defendants' jury convictions on various charges of assault and battery on the police officers. *Id.* at 797.

[29]On appeal, Olan does not challenge the judge's ruling that the Olans' ac-

to give her notice as required by both State and Federal law, and that, to the extent that State law would allow termination of her tenancy without prior notice, it is preempted by Federal law regarding notice of tenancy terminations in federally-subsidized housing projects.[30] Olan essentially contends that because the Authority failed to give notice as required by Federal law, the judgment must be vacated and the Authority's complaint must be dismissed.

To trigger preemption analysis, "[t]here must be 'actual, impermissible conflict.' " *Attorney Gen.* v. *Brown*, 400 Mass. 826, 829 (1987). No relevant notice provisions of the Federal statute or regulations conflict with the Commonwealth's notice provisions.[31,32]

---

tions violated the lease provision that tenants live in a "peaceful way." However, the same conduct that the judge found in violation of G. L. c. 139, § 19, also constituted the lease violation. Since Olan requested a jury trial on all issues and we hold that this was her right, at least as to the alleged statutory violations, we think it appropriate under the circumstances to remand the lease violation issues as well as the statutory issues for jury resolution at any new trial.

[30]See *Thorpe* v. *Housing Authy. of Durham*, 393 U.S. 268, 277-281 (1969) (local public housing authority that is federally subsidized must comply with Federal law regarding notice provisions when terminating public housing tenancies).

[31]At the time these proceedings were initiated, the relevant notice provisions of 24 C.F.R. § 966.4(l)(3)(i) (1997) provided, "The PHA [public housing authority] shall give written notice of lease termination of: . . . (B) A reasonable time considering the seriousness of the situation (but not to exceed 30 days) when the health or safety of other residents or PHA employees is threatened; and (C) 30 days in any other case." The notice must state the specific grounds for termination, inform the tenant of the right to reply, the right to examine any relevant public housing authority documents, and the right to request a housing authority grievance hearing before termination if the PHA is required to do so in the circumstances. See 42 U.S.C. § 1437d(l)(3), (6). In comparison, G. L. c. 139, § 19, provides that "[n]o . . . injunction shall be issued except after notice has been given to the tenant and a hearing has been held with opportunity for the tenant to confront and cross-examine witnesses and to present any legal or equitable defense." Section 19 further provides, "A housing authority or provider of state or federally assisted housing shall not avail itself of . . . [§ 19] remedies . . . except after notice, hearing, and decision on the merits by the court." See also G. L. c. 121B, § 32, as amended by St. 1995, c. 179, § 5: "The tenancy of a tenant of a housing authority shall not be terminated without cause and without reasons therefor given to·said tenant in writing prior to such housing authority filing an action for summary process or seeking an injunction pursuant to [c. 139, § 19]."

[32]Neither do other preemption theories apply. There is no express statement

Even assuming without deciding that the Authority's complaint did not technically adhere to all of the Federal and State notice provisions, Olan nonetheless had actual notice of the proceedings against her that comported with due process principles on both the Federal and State levels. On the Federal level, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U.S. 1, 13 (1978), quoting from *Mullane* v. *Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950). In the Commonwealth, "[t]he purpose of notice is to give fair warning to a party of the nature of an opponent's claim, a reasonable opportunity to engage counsel, and the time to prepare to oppose the claim." *Pinkowitz* v. *Edinburg*, 22 Mass. App. Ct. 180, 186 (1986).

Olan was served with the complaint on July 11, 1997, which specified the grounds for the proceedings and the relief requested. She was able to retain counsel, answer the complaint, file pretrial motions, obtain witnesses, present a defense, and was given a judicial hearing. Although Olan argues that she was prejudiced by the lack of notice, she fails to point to any specific example of how she was so prejudiced.

Finally, despite being present for all of the proceedings, Olan failed to raise the issue of notice until after all of the evidence was taken and judgment was rendered. Given that Olan had actual notice, we decline to nullify the judgment on the suggested per se basis. We are satisfied that Olan knew "with reasonable particularity of the proposed action so that [she could] reasonably prepare h[er] arguments." *Spence* v. *O'Brien*, 15 Mass. App. Ct. 489, 498 (1983), quoting from *Milton* v. *Massachusetts Bay Transp. Authy.*, 356 Mass. 467, 471 (1969).

---

of preemption in the Federal statute (see note 31, *supra*); nor is the Federal scheme so comprehensive that we can infer an intent to preempt. See *Attorney Gen.* v. *Brown*, 400 Mass. at 828.

The judgment is vacated and the case is remanded to the Housing Court for a jury trial consistent with this opinion.[33]

*So ordered.*

---

[33]Since we remand this case for a new trial, we need not reach Olan's contentions that the trial judge's discovery, evidentiary, and scheduling orders were an abuse of discretion that deprived her of a fair trial.